U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - LAKE CHARLES

MAR 24 2008

ROBERT H. SHEMWELL, CLERK
BY_____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| BEAUREGARD PARISH SCHOOL BOARD | : | DOCKET NO. 2:05 CV 1388 |
| VS. | : | JUDGE MINALDI |
| HONEYWELL INC. | : | MAGISTRATE JUDGE KAY |

## MEMORANDUM RULING

Before the court is a Motion to Exclude Expert Testimony of Lawrence W. Blanchette, [doc. 112], filed by the defendant Honeywell, Inc. (hereinafter "Honeywell"). Although the plaintiff, Beauregard Parish School Board (hereinafter "BPSB"), did file an Opposition, the Motion is considered unopposed due to its untimely filing.[1]

## FACTS

The September 24, 2007 Memorandum Ruling thoroughly summarizes the underlying dispute between the parties.[2] On September 24, 2007, this court granted partial summary judgment in favor of Honeywell, and dismissed Beauregard's extracontractual claims, which included: a claim arising under the Louisiana Unfair Trade Practices and Consumer Protection Law, a misrepresentation claim, an unjust enrichment claim, a detrimental reliance claim, and a claim for new Trane chillers.[3] This court also held that the contract's consequential damage

---

[1] *See* Mem. Order (Feb. 28, 2008) [doc. 120].

[2] Mem. Ruling (Sept. 24, 2007) [doc. 95].

[3] Judgment (Sept. 24, 2007) [doc. 96]

1

waiver clause was enforceable.[4] The parties will start a two-week bench trial on June 16, 2008.

## FEDERAL RULE OF EVIDENCE 702

FED. R. EVID. 702 provides that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court tasked the federal district courts with a gatekeeper function to keep unreliable expert testimony out of evidence. 509 U.S. at 589. The *Daubert* Court articulated a non-exclusive and non-dispositive checklist for federal district courts to use when assessing the reliability of expert testimony. *Id.* This gate-keeping function extends to all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Trial judges have "considerable leeway in...determining whether particular expert testimony is reliable." *Id.* at 155. "Both the determination of reliability and the factors taken into account are left to the discretion of the district court consistent with its gatekeeping function under FED. R. EVID. 702." *Munoz v. Orr*, 200 F.3d 291, 301-02 (5th Cir. 2000).

## ANALYSIS

Honeywell argues that this court should exclude Blanchette's testimony in its entirety for five reasons. First, Honeywell argues that Blanchette's energy savings analysis is unreliable because he is not an expert, his methodology does not meet industry standards, his calculations

---

[4] *Id.*

2

lack a foundation, and are contrary to the laws of physics. Second, Honeywell argues that Blanchette impermissibly offers legal conclusions. Third, Honeywell argues that Blanchette cannot testify about the parties' state of mind or subjective intentions. Fourth, Honeywell argues that Blanchette's opinions about the lighting scope should be excluded because they interpret the contract and are premised on parol evidence. Fifth, Honeywell argues that there is no legal or factual basis for Blanchette's opinions about training, missing energy-saving opportunities, or a refund of service fees.

### I.) Blanchette's Qualification as an Expert Witness, Blanchette's Methodology, Foundation for Blanchette's Data, and the Laws of Physics

#### A.) Expert Qualification

Expert status can arise from formal credentials as well as experience with a particular topic. *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1110 (5th Cir. 1991) (en banc). At the *Daubert* hearing, "the only question for the trial court is whether the expert is generally qualified to render an opinion on the question in issue." *Id.* An expert can gain the requisite knowledge or skill from training or education, or from hands-on experience. *Sullivan v. Rowan Co.*, 952 F.2d 141, 145 (5th Cir. 1992). "A trial judge has wide discretion to admit or exclude expert testimony." *Id.* at 144. In *Sullivan*, the Fifth Circuit upheld a trial court's rejection of a scientist as a metallurgical expert witness. *Id.* at 145. The trial court found that although the scientist, trained in microfossils and not engineering, performed over 1,000 projects involving metal failure and attended a three-day metallurgical seminar, the scientist still needed additional training or experience in the metallurgical field before the scientist could render an expert opinion. *Id.*

Blanchette is a licensed mechanical engineer, but has not had any course work or formal

training in the field of measurement and verification savings (hereinafter "M&V").[5] Blanchette had never performed an M&V analysis himself on an initial basis to reconcile energy savings on an annual basis.[6] In fact, Blanchette initially hired ABRAXAS to perform the analysis for him, using the Metrix system, because Blanchette did not know how to operate Metrix.[7] When ABRAXAS concluded that the data Blanchette provided was "of inconsistent quality," Blanchette instructed ABRAXAS to use an artificially low temperature balance point to alter the results.[8] ABRAXAS did as instructed, but issued a disclaimer stating that "the balance point was inappropriate for the fit which existed between weather and utility bills," and that this second round of savings numbers "should be treated with far less confidence" than the first set of savings numbers.[9] Furthermore, Blanchette has never published or written any materials on anything other than air quality.[10] Blanchette has also never testified as an expert, in any field, prior to this litigation.[11]

Blanchette is not qualified to render expert testimony in the M&V field. He lacks formal training in M&V, and has never published or testified in the field. Although experts may also gain experience through informal training, Blanchette has not done so. Blanchette has never

---

[5] Def.'s Ex. 5, pp. 299-306.

[6] *Id.*

[7] *Id.* at 98.

[8] Def.'s Exs. 12, 14.

[9] Def.'s Ex. 14.

[10] *Id.* at 332-34.

[11] *Id.* at 331.

performed an M&V analysis himself and did not know how to use the Metrix system and had to hire an outside firm to perform the analysis.[12] Thus, Blanchette lacks the qualifications to testify as an expert in M&V.

### B.) Methodology

District courts may also consider the *Daubert* factors by examining the expert's methodology. *Kumho*, 526 U.S. at 153. "This determination of reliability includes a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592.

There are three industry standards guidelines for M&V: the IPMVP, FEMP, and ASHRAE 14 guidelines.[13] Under the IPMVP, there are four possible approaches to an M&V analysis: 1.) stipulated savings, which focuses on verifying that the measures are properly installed and have the capacity to save the contracted levels of energy; 2.) measure isolation, which employs engineering calculations and site measurements to confirm the savings resulting from specific measures; 3.) whole-building evaluation, which most often performs a utility bill analysis to evaluate savings; and 4.) simulation, which uses computer energy models to compute savings as a function of the important independent variables.[14]

Blanchette performed a whole-building analysis based on utility bills.[15] Honeywell

---

[12] This analysis was not used for the final report. Def.'s Ex. 5, p. 165.

[13] Def.'s Ex. 7, p. 6.

[14] *Id.* at 6-7.

[15] Def.'s Ex. 2, p. 19.

argues that the whole-building analysis was inappropriate because this option is not recommended when savings are a small percentage of district-wide savings.[16] Honeywell argues that any savings generated by the retrofit would be masked by the hundreds of other factors that affect energy use, such as weather, hours of operation, changes in building use or occupancy, temperature settings at the schools, changes in utility rates, and reimbursement of utility costs.[17] Honeywell notes that Blanchette simply ignored each of these factors as if no changes occurred. Blanchette states that the baseline adjustments were ten years old and undocumented, calling them "educated guess[es]."[18]

"Weather is often the most important independent variable, affecting most of the systems covered under this guideline."[19] Initially, Blanchette attempted to account for weather by employing ABRAXAS to perform the analysis, but when that analysis failed, Blanchette abandoned the weather variations in his final report.[20] Computers are also an important variable because they generate additional heat and thus require more air conditioning.[21] Although

---

[16] "This Option is intended for projects where savings are expected to be large enough to be discernable from the random or unexplained energy variations that are normally found at the level of the whole facility meter." Def.'s Ex. 8, p. 28. Moreover, this option is not used if the savings are less than 10% under the IMPVP or ASHRAE 14 models, or 20% under the FEMP guidelines. *Id.* at 33.

[17] "Accounting for changes is the major challenge associated with [a utility bill analysis], particularly for long-term contracts." Def.'s Ex. 9, p. 20.

[18] Def.'s Ex. 5, pp. 202-03. No one on the school board knew to set aside the data so it could be addressed on an annual basis, leading Blanchette to conclude that the baseline adjustment is a "guess" and "not reality." *Id.* at 206.

[19] Def.'s Ex. 10, p. 10.

[20] Def.'s Ex. 3, pp. 26-28; Ex. 5, p. 165; Ex. 7, p. 36.

[21] Def.'s Ex. 7, pp. 36, 41-42.

Blanchette admits that BPSB added air conditioner units for its new computer labs, which would increase energy consumption, he did not adjust for these variables because BPSB did not provide him with the bills he requested to perform this analysis.[22] Moreover, Honeywell argues that Blanchette failed to verify his adjustments or compare his results against BPSB's actual utility bills, stating such a comparison is impossible because there are "100 things consuming energy in that building."[23] Blanchette further noted that the data is an "assumption" and that the baseline adjustments are all "theoretical."[24]

Thus, Honeywell argues that Blanchette's analysis does not employ proper methodology, and violates "most or all of the guidelines presented in all of the nationally recognized M&V guidelines."[25] This court agrees that Blanchette's reliance upon a utility bill analysis was the improper approach in this case, especially since he did not adjust for several crucial variables. Thus, this court finds that Blanchette departed from accepted methodology in the M&V field.

## C.) Foundation of Blanchette's Data and Calculations

The district court must "ensure that an expert's testimony rests upon a reliable foundation." *Guillory v. Domtar Indus., Inc.*, 95 F.3d 1320, 1330-31 (5th Cir. 1996). In *Guillory*, the Fifth Circuit found that the district court properly limited Dr. Reed's testimony because it was based on "altered facts and speculation designed to bolster [the defendant's]

---

[22] Def.'s Ex. 5, pp. 112-14, 545-46; Ex. 13; Ex. 17.

[23] *Id.* at 522.

[24] *Id.* at 528.

[25] *Id.* at 35; *see also id.* at 35-37 (listing Blanchette's departures from good M&V practices).

position." *Id.* at 1331 (quoting the district court transcript where the judge stated that Dr. Reed's testimony was based on a series of speculations of what could have happened). Even though the court found Dr. Reed made as accurate a measurement as he could, the court nonetheless excluded Dr. Reed's testimony because it was still based on speculation. *Id.* The Fifth Circuit noted that "expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all. Both analyses result in pure speculation." *Id.*

Honeywell argues that Blanchette's opinions are speculative and should thus be excluded.[26] Blanchette concedes that his calculations are "just an exercise to come up with theoretical base line adjustments that are not true."[27] Honeywell further argues that it is undisputed that BPSB significantly increased the number of computers, labs, and related equipment during the contract period, all of which increased BPSB's energy expenditure, and makes a utility bill analysis misleading. Blanchette did make adjustments for changes in technology; however, Honeywell notes that these adjustments were based on district-wide

---

[26] Honeywell cites to several instances of Blanchette's speculations. For example, even after ABRAXAS told Blanchette that the data was inherently unreliable and of an inconsistent quality, Blanchette did not model actual BPSB schools, but rather instructed his assistant, Aymond, to input a series of hypothetical data. Def.'s Ex. 5, pp. 392-94, 496-501, 510-20. In one instance, Aymond assumed that every window in each building was one foot square, even though Blanchette knew this was not true. *Id.* at 513-16. Furthermore, Blanchette instructed Aymond to assume that every building had an air infiltration of zero, even though he knew this was not accurate. *Id.* at 516-18. Blanchette also speculated about pre-existing usage patterns for the air conditioning units that Honeywell replaced, and used this hypothetical data in his calculations, stating "none of it is real." *Id.* at 525-28. Blanchette further guessed about the condition and structure of the roofs. *Id.* at 69-72, 496-500. Blanchette entirely omitted printers, copiers, and vending machines from his analysis. *Id.* at 541-43. Blanchette also did not account for changes in weekend and after-school activities, or school schedules. *Id.* at 552-53. Blanchette did not consider enrollment changes in individual schools, changes in student-to-teacher ratios, or changes in the number of classrooms in each school. *Id.* at 553-56.

[27] Def.'s Ex. 5, p. 528.

estimates given to Blanchette by Dean Hieronymous, a BPSB employee.[28] Blanchette did not verify or test this data, nor does Blanchette know how Hieronymous computed the data.[29] Hieronymous made private handwritten notes stating, "How much is electricity costing us to run the x-tra computers that were not here when Honeywell started? We need a lower # of hours of usage!"[30] Blanchette did not consider any possible bias in Hieronymous' numbers, nor could he describe how Hieronymous obtained his field measurements.[31]

This court agrees that under *Daubert* and *Guillory*, Blanchette's data is speculative and lacks foundation. Accordingly, his analysis is unreliable and is excluded.

### D.) Law of Physics

Honeywell also argues that Blanchette's conclusions are contrary to the law of physics because Blanchette admits that the measurements of light fixtures retrofitted by Honeywell must have saved BPSB energy,[32] yet Blanchette's calculations show that the Honeywell retrofits increased energy usage over the contract.[33] For the reasons discussed above, this court finds that Blanchette is not qualified as an expert in M&V and that his energy savings analysis is unreliable.

### II.) Legal Conclusions

---

[28] *Id.* at 267-70, 531-37.

[29] *Id.*

[30] Def.'s Ex. 18.

[31] Def.'s Ex. 5, pp. 267-68.

[32] *Id.* at 382-85.

[33] Def.'s Ex. 2, p. 19.

Expert witnesses may not offer legal conclusions. *See, e.g., Estate of Sowell v. United States*, 198 F.3d 169, 171-72 (5th Cir. 1999). Honeywell argues that Blanchette impermissibly offers legal conclusions throughout his expert report. Honeywell cites several occurrences where Blanchette, in his Engineering Analysis Report for BPSB, offers legal conclusions, such as: Honeywell breached its contract,[34] Honeywell acted in bad faith,[35] Honeywell acted fraudulently,[36] Honeywell was negligent and grossly negligent,[37] Honeywell breached a legal duty or standard of care,[38] and Honeywell waived its contractual rights.[39] Honeywell also argues that Blanchette offers his views on the rights and obligations of the parties under their contract.[40] Moreover, Blanchette admits that he offered legal opinions and stated he believes he is qualified to do so.[41] Because experts are not permitted to offer legal conclusions in expert testimony, and this court finds that Blanchette impermissibly interjected several legal opinions and conclusions in his expert report, this court agrees with Honeywell that these opinions must be excluded.

III.) Parties' State of Mind or Subjective Intentions

Courts do not permit experts to testify on the parties' state of mind or subjective

---

[34] Def.'s Ex. 2, pp. 2, 7, 14; Def.'s Ex. 3, pp. 8, 11, 16.

[35] Def.'s Ex. 2, pp. 2, 7; Def.'s Ex. 3, pp. 14, 16.

[36] Def.'s Ex. 2, p. 3; Def.'s Ex. 3, pp. 14-15, 20.

[37] Def.'s Ex. 2, pp. 16, 19; Def.'s Ex. 3, pp. 8, 11.

[38] Def.'s Ex. 2, pp. 3, 7; Def.'s Ex. 3, p. 23.

[39] Def.'s Ex. 2, pp. 16, 21; Def.'s Ex. 3, pp. 11, 25.

[40] Def.'s Ex. 2, pp. 5-12, 15-17; Ex. 3, pp. 8-11, 24-26.

[41] Def.'s Ex. 5, pp. 127-29.

intentions. *Vaulting & Cash Serv., Inc. v. Diebold, Inc.*, No. Civ. A. 97-3686, 1998 WL 726070, *1 (E.D. La. Oct. 15, 1998). Honeywell argues that Blanchette repeatedly offers his opinions that Honeywell acted in bad faith or with the intent to defraud.[42] This court agrees with Honeywell that Blanchette impermissibly offered his opinions on Honeywell's subjective intentions, and thus finds these opinions inadmissable.

### IV.) Opinions About Lighting Scope

When the scope of a contract is clear and complete, parol evidence is inadmissible. *Condrey v. Suntrust Bank of Ga.*, 429 F.3d 556, 563 (5th Cir. 2005) (applying LA. CIV. CODE art. 1848, which bars testimonial or other evidence to negate or vary a contract). Honeywell argues that Blanchette impermissibly relies upon pre-contractual negotiations, proposals, discussions, and other parol evidence in estimating that Honeywell should replace lighting at a cost of $595,085.[43] Honeywell argues that it had several proposed alternatives for lighting options in its negotiations with BPSB, and that BPSB selected a less costly alternative for the project. Honeywell argues that Blanchette relies on some of the proposals that were not selected in computing his damages.[44] To the extent that Blanchette refers to pre-contractual negotiations, proposals, discussions, and other parol evidence in his expert report, such evidence is inadmissible.

### V.) Opinions About Training, Missed Energy-Saving Opportunities, or Refund of Service Fees

Blanchette claims that BPSB suffered a $1,736,500 claim for "lost training

---

[42] Def.'s Ex. 2, pp. 13, 17; Ex. 3, pp. 11-16, 19, 24-25.

[43] *See* Def.'s Ex. 2, pp. 9-12, 19; Ex. 3, p. 33; Ex. 5, pp. 60-65, 263.

[44] Def.'s Ex. 30; Def.'s Ex. 6, pp. 11-17).

11

opportunities."[45] The Honeywell-BPSB contract called for approximately ten hours per year of training, which was to consist of tutorials for faculty and students and some limited equipment training for maintenance personnel.[46] The stated cost for this training was $4,777 for the ten-year contractual period.[47] Apparently, Honeywell did not perform all of the training. In Blanchette's report, he relies on marketing materials from Energy Education, Inc. (hereinafter "EEI") to extrapolate the potential energy savings.[48] Blanchette states that "school board's [sic] similar to BPSB are saving between 22-26% of their annual energy expenditure through training, education, and monitoring," and estimated the value of the program as $1,736,500 (at a 23% savings).[49]

Honeywell argues that Blanchette's expert report has no factual basis. First, Honeywell argues that EEI's marketing materials are unverified, contain little information about the schools at issue, and offer no justification for its data. Honeywell further argues that Blanchette did not investigate EEI's claims. Further, Honeywell argues that EEI's training programs are fundamentally different than those specified in Honeywell's contract; namely, the EEI programs required the school district to have full-time on-site energy managers, undergo extensive training, purchase thousands of dollars of energy tracking software, and pay EEI monthly service fees ranging from $5,000 to $9,200, whereas Honeywell's program called for ten hours of training per

---

[45] Def.'s Ex. 3, p. 33.

[46] Def.'s Ex. 6, pp. 26-28; Ex. 7, p. 29.

[47] Def.'s Ex. 19.

[48] Def.'s Ex. 2, pp. 17-20. EEI performed energy training for three Louisiana school districts. *Id.*

[49] Def.'s Ex. 3, p. 33.

year.[50]

Second, Honeywell argues that Blanchette's opinions about missed hypothetical technology opportunities should be excluded. Blanchette states that Honeywell should be liable for $470,000 in "missed technological opportunities." Honeywell argues that because nothing in the contract required Honeywell to provide this service, Blanchette's opinion is speculative. Moreover, Blanchette also states that Honeywell owes BPSB $125,000 for failing to provide annual construction advice.[51] Similarly, Honeywell argues that because this service was not in the contract, Blanchette's opinions are mere speculation.

Lastly, Blanchette speculates that Honeywell should fully refund all service fees that BPSB paid.[52] Honeywell argues that it performed preventative maintenance and repair work, which BPSB accepted and paid for. Honeywell thus argues Blanchette's opinions on service fees, missed technological opportunities, and training are biased and baseless, and should be excluded.

This court agrees that Blanchette's valuation of lost training savings is baseless. The EEI program and Honeywell's training program are fundamentally different, and thus the EEI program does not provide a good comparison. This court further agrees that Blanchette's claims for missed technological opportunities is speculative. Furthermore, this court finds that Blanchette does not have a factual basis for his opinion that Honeywell should refund the service fees.

---

[50] Def.'s Exs. 20-23.

[51] In Def.'s Ex. 2, p. 19, Blanchette apparently bases this figure off of Honeywell's proposal stating the "intrinsic value" of Honeywell's advice.

[52] Def.'s Ex. 3, p. 33.

13

## CONCLUSION

IT IS ORDERED that Honeywell's Motion to Exclude Expert Testimony of Lawrence W. Blanchette is hereby GRANTED, and Blanchette's expert testimony shall be excluded in its entirety.

Lake Charles, Louisiana, this ____ day of ___March___, 2008.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE